IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ALEXANDRA A. S.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 3:19-cv-01074-GCS[2] |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM & ORDER**

**SISON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disabled Adult Child ("DAC") benefits pursuant to 42 U.S.C. § 423.

PROCEDURAL HISTORY

Plaintiff applied for benefits in December 2015, alleging disability beginning on December 25, 2012. She later amended her onset date to her eighteenth birthday, November 10, 2013. After holding an evidentiary hearing, an Administrative Law Judge ("ALJ") denied the application in October 2018. (Tr. 15-31). The Appeals Council denied

---

[1]   In keeping with the court's usual practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. PROC. 5.2(c) and the Advisory Committee Notes thereto.

[2]   This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). *See* (Doc. 12, 20).

review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## ISSUE RAISED BY PLAINTIFF

Plaintiff raises the following issue:

> The ALJ erred in assessing Plaintiff's statements about the intensity, persistence and limiting effects of her symptoms.

## APPLICABLE LEGAL STANDARDS

To qualify for DAC benefits, a claimant who is over the age of 18 must have a disability which began before she reached the age of 22. *See* 20 C.F.R. § 404.350(a)(5). Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

The usual sequential analysis applies here. *See* 20 C.F.R. § 404.1520(a)(2). To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? *See* 20 C.F.R. § 404.1520(a)(4).

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *See Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## THE DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. He determined that Plaintiff had not been engaged in substantial gainful activity since the alleged onset date.

The ALJ found that Plaintiff had severe impairments of affective, anxiety, and personality disorders, and a history of substance abuse.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform the full range of work at all exertional levels with the following non-exertional limitations: simple, routine, repetitive tasks in a work environment free of fast-paced quota requirements involving only simple work-related decisions with few, if any, work place changes; no interaction with the public; and only brief, superficial interaction with co-workers.

Plaintiff had no past relevant work. Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff was not disabled because she was able to do jobs that exist in significant numbers in the national economy.

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. This summary of the record discusses only the evidence relevant to Plaintiff's arguments.

### 1. Agency Forms

Plaintiff claimed disability because of mental issues, depression, bipolar, general anxiety, social anxiety, IBS, GERD, fibromyalgia, and limited focus on daily tasks. In

December 2015, she said she had never worked. (Tr. 236). In January 2016, Plaintiff reported that she had worked part-time as a personal assistant paid by the Illinois Department of Rehabilitation. She did this work from August 2011 to October 2014 and from May to August 2015. (Tr. 274).

In January 2016, Plaintiff reported that her ability to work was limited because a lack of focus and motivation made it difficult to complete tasks. She was mentally and physically exhausted all the time. She said she was afraid to go anywhere alone. She regularly went into "fugue states" and "dissociative states." She described a "normal day" as "to stay in bed mostly, or go to my boyfriends [sic] and lay down to watch movies." On a good day, she loved to cook and bake. She did laundry for herself and her mother and vacuumed and washed dishes. Her mother handled her "paperwork" because she got too overwhelmed. People made her nervous. (Tr. 257-269).

### 2.    Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in April 2018. (Tr. 40).

Plaintiff lived with her mother and grandmother. Her boyfriend was staying with them. (Tr. 44). She graduated from high school a semester early and took a few classes at community college. She dropped some of the college classes because she could not keep up with all of it. She could not return to college because she had a lot of anxiety as well as physical issues. (Tr. 48-49). Plaintiff explained that she graduated from high school early because she became unable to go to school and was taught from home. She said that her teachers made it easy for her to finish. (Tr. 67).

Plaintiff worked part time for the Plant Stand, where her duties were mostly taking care of plants. She worked there for less than one hundred hours total. She worked as a caregiver for her aunt in 2013 and 2014. She made over $7,000.00 in that job. She stopped doing that because her mental and physical issues were "too intense." (Tr. 50-53).

Plaintiff testified she would be unable to do the Plant Stand job because she had an extremely difficult time communicating and socializing. She got "confused" and "lost." (Tr. 66).

Plaintiff started a business making soap in June 2016. She had a booth at a craft fair for one day. Her mother and boyfriend were there with her. It was very stressful. (Tr. 68-70). She was unable to go to a store by herself because her anxiety had gotten worse. She felt she would be unable to live on her own because she would not be able to take care of herself. (Tr. 72-73).

A VE testified that there are no jobs for a person who could have no contact with the public, co-workers, or anyone else. Similarly, there would be no jobs for a person who needs constant direction or redirection or who would be off task for more than 10 percent of the workday. (Tr. 96-98).

### 3.    School Records

In February 2013, Plaintiff was approved by her high school to attend school from home with the assistance of a home teacher. She had been "experiencing emotional issues and resorted to cutting." She was under the care of a psychiatrist who prescribed medication for major depressive disorder/recurrent and bipolar affective disorder. (Tr. 360).

### 4. Medical Records

Dr. Yanamadala, a psychiatrist, began treating Plaintiff in January 2013 when she was 17 years old. She had been depressed for a month and had been cutting herself. Her grades had dropped, and she had poor concentration, poor energy, crying spells and was isolating. The doctor recommended "homebound." He diagnosed major depressive disorder, recurrent, without psychotic features, and prescribed Trazodone, Depakote, and Lexapro. (Tr. 492-496).

Dr. Yanamadala continued to see Plaintiff through June 2016. His records are somewhat confusing because the notes repeat observations from earlier visits, making it difficult to discern exactly when the events described took place. (Tr. 497-549, 552-557). Overall, his records indicate that Plaintiff's symptoms waxed and waned, and he changed her medications several times. Her mother attended appointments with her. On exam, she generally had intact concentration and memory, logical and goal directed thought processes, intact judgment and insight, and normal reasoning. She was not suicidal and had no hallucinations or violent thoughts. Her mood was sometimes low, sad, and/or anxious, and she sometimes had helpless and hopeless thought content. She denied substance abuse. At times, the doctor noted she was working twenty hours a week, taking classes at community college, had a boyfriend, and was going to the gym. In December 2015, the doctor noted that Plaintiff had stopped taking Topamax; he recommended that she increase the dosage of Pristiq, but she refused. Plaintiff was not going to school or working, and she was applying for social security disability. (Tr. 544). In June 2016, Dr. Yanamadala added a note that Plaintiff had tapered herself off all medications except

Trazodone. She had some mood issues, but it was manageable. She was not seeing a counselor and did not want any new medications. (Tr. 553).

In September 2016, Plaintiff saw her primary care physician, Dr. Stabell, for a "THC application" to treat her "total body pain." The doctor noted that her psychiatrist had left the area, and Plaintiff wanted her to take over prescribing Trazodone. Dr. Stabell recommended that she see another psychiatrist. Her mood was stable, and her anxiety disorder was stabilized "remaining in a structured home environment." She noted that Plaintiff had been "on marijuana treatment" for mood issues since she was a young child and she wanted to "become legal with her marijuana use." Neuro-psychiatric exam was grossly normal. (Tr. 639-641). The doctor completed a certification form for medical cannabis, certifying that Plaintiff was diagnosed with severe fibromyalgia and residual limb pain.[3] (Tr. 740-741).

Plaintiff was seen at Center Pointe Hospital in November 2016 with her mother, seeking outpatient treatment for anxiety and depression. She said she had increased anxiety and depression for the past year, and daily panic attacks. She said she had attempted suicide twice, most recently in 2013. She was seeing Dr. Sanjay Nigam, a psychiatrist, and Mike Homan, a therapist. The diagnoses were bipolar disorder without psychotic features and generalized anxiety disorder. The doctor recommended admission to an intensive outpatient therapy program, but Plaintiff and her mother were

---

[3] "Residual limb pain, sometimes called stump pain, is a type of pain felt in the part of a limb that remains after an amputation." https://www.mayoclinic.org/diseases-conditions/residual-limb-pain/cdc-20447167, visited on September 16, 2020. There is no indication in the medical records that Plaintiff had a limb amputated.

unwilling to schedule and were to call back the next day. (Tr. 560-563).

In October 2016, Plaintiff complained to therapist Homan of agitation, anxiety, manic episodes, and mood swings. (Tr. 706). In December 2016, she appeared to have "accepted the need for medication at this time." (Tr. 708). About two weeks later, he noted she was taking Trazodone. (Tr. 710). In January 2017, she reported that Trazodone was helping, and she was able to regulate her moods much better. (Tr. 713).

Plaintiff told Dr. Stabell in March 2017 that she had seen the new psychiatrist and was learning neurocognitive techniques that "helped her immensely with mood management." (Tr. 636). This is presumably a reference to Dr. Nigam.[4] Dr. Stabell noted that Plaintiff was back on Olanzapine (Zyprexa) and was also taking Trazodone. (Tr. 637). In October 2017 Plaintiff reported that she was not taking any psychiatric medications. Plaintiff said she was nervous and anxious and felt agitated, confused, and unable to concentrate. Dr. Stabell advised her to return to Dr. Nigam and restart her medications. (Tr. 632-633). In December 2017, Plaintiff told Dr. Stabell that she was much less anxious since restarting Trazadone and Xanax. She was seeing a nurse practitioner at the psychiatrist's office. Dr. Stabell noted that Plaintiff came to the office unattended by her mother for the first time, and she was "quite a bit calmer than any previous visit." Plaintiff was well-behaved and "very adult" in her conversation. (Tr. 615-617).

Plaintiff began seeing a new primary care physician, Dr. Chiang, in January 2018

---

[4] There are no office notes signed by Dr. Nigam in the record. The record does contain notes from a nurse practitioner at Southern Illinois Associates who rendered psychiatric care during this period. (Tr. 744-788). These notes may be from Dr. Nigam's office, but they are very blurry and barely legible.

because she felt her prior doctor did not have time for her. She was accompanied by her boyfriend. She was taking Xanax and Trazodone. (Tr. 717-721).

In April 2018, a few days before the hearing, Plaintiff went to Chestnut Health Systems to establish care with a new psychiatrist. She was evaluated by an advanced practice nurse ("APN"). Plaintiff was wearing earmuffs and holding a stuffed owl. She said she had a medical cannabis card for fibromyalgia. She had been taking Xanax only as needed. Her goal was to be free of pharmaceuticals. She had discontinued several medicines over the past few years because she did not feel well or feel like herself. She said she was unable to work because of illness, but, if she were able, she would like to start an allergen-friendly café. On exam, she was oriented, and her attitude was cooperative and receptive. Memory was intact. She averted her eyes. Her affect was anxious, and her mood was worried. Her thought process was coherent and goal directed and her thought content was appropriate. She denied suicidal ideation. Insight was fair and judgment was "Fair. Poor." The APN rated Plaintiff's ability to participate in treatment as high and her willingness to participate as moderate. The APN recommended that Plaintiff take Xanax daily as prescribed and to continue taking Trazodone. (Tr. 733-737).

### 5. State Agency Consultants' Mental RFC Assessment

State agency consultants assessed Plaintiff's Mental RFC based on a review of the record in February and July 2016. They rated Plaintiff as "moderately limited" in ability to carry out detailed instruction; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, ability to maintain

regular attendance and be punctual within customary allowances; and ability to complete a workday and workweek without interruptions from psychological symptoms. They concluded that Plaintiff was capable of performing simple, routine, and unskilled vocational activities with reduced social demands. (Tr. 111-113, 139-140).

## ANALYSIS

Plaintiff takes issue with the ALJ's assessment of the reliability of her subjective statements.

The "credibility findings" of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005).

SSR 16-3p, effective March 28, 2016, superseded SSR 96-7p on evaluating the claimant's statements about her symptoms. SSR 16-3p does not change the prior standard; rather, it emphasizes that:

> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's

> evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities . . . .

SSR 16-3p, 2016 WL 1119029, at *10.

As did SSR 96-7p, the new SSR requires the ALJ to consider the entire record, and to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3p, at *7.

The ALJ is required to give "specific reasons" for his evaluation of Plaintiff's statements. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid. See also Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(noting that the ALJ "must justify the credibility finding with specific reasons supported by the record.") If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, at *9.

Here, the reasons given by the ALJ for rejecting Plaintiff's statements are not supported by the record and are not valid.

The ALJ discounted Plaintiff's allegations because they were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 23). He then went on to identify what he considered to be inconsistencies.

First, the ALJ noted that in "initial paperwork" Plaintiff said she had never worked, but on later forms she identified some part-time work that she had done. Plaintiff identified this part-time work in a form submitted only one month after the first form. This hardly appears to be a serious attempt to mislead the agency, and the ALJ determined that her part-time work was not substantial gainful activity in any event. The ALJ also erroneously equated her part-time and temporary work with an ability to work full-time, noting the DOT descriptions of the jobs she had done. (Tr. 24). However, an ability to work part-time or for a short period of time is not incompatible with disability. *See Goins v. Colvin*, 764 F.3d 677, 679 (7th Cir. 2014). The ALJ overstated Plaintiff's "business" selling bath products. She testified that she had a booth at a craft fair for one day, and her mother and boyfriend were with her the whole time. (Tr. 69-70). Similarly, her work at the Plant Stand consisted of 3 to 12 hours of work a week during the summer of 2017. (Tr. 347). And, the ALJ ignored the fact that the ability to assist her grandmother and aunt with household chores does not necessarily contradict her claim that her mental impairments would not permit her to work outside the home environment. "We have remarked the naiveté of the Social Security Administration's administrative law judges in equating household chores to employment." *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013). Likewise, her stated desire to open an allergen-friendly café if she were able does not contradict her claim that she is not able to work. *See Hill v. Colvin*, 807 F.3d 862,

868 (7th Cir. 2015).

The ALJ repeatedly noted that Plaintiff completed high school early. (Tr. 21, 22, 25, 28). However, Plaintiff does not allege that she is disabled because of low intellectual ability. She testified that her teachers made it easy for her to graduate and she did not even have to take most final exams. (Tr. 67-68). Her ability to finish high school a semester early while homebound because of psychiatric symptoms does not contradict her allegations.

The ALJ said that Plaintiff had been "non-compliant" with treatment recommendations, noting that she had stopped taking prescribed medications. He said that failure to follow prescribed treatment can be considered evidence that the claimant does not believe that her impairments are as debilitating as she claims. (Tr. 24). He failed to note that therapist Homan worked with her to get her to accept the need for medication. (Tr. 708). Further, she explained to the APN at Chestnut Health Systems that she had stopped medications at times because she did not like the way they made her feel. (Tr. 733-737). The ALJ's observation "ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications." *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010).

Lastly, the ALJ made much of Plaintiff's inconsistent statements to healthcare providers about her marijuana use. (Tr. 25, 26-27). This is the kind of assessment of overall character or truthfulness prohibited by SSR 16-3p, *supra*.

An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the

evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)(internal citations omitted). The Court must conclude that the ALJ failed to build the requisite logical bridge here. Instead, he relied on factors that were irrelevant and misconstrued the significance of others. His assessment of Plaintiff's allegations cannot stand.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for Disabled Adult Child benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

DATE: September 24, 2020.

Digitally signed by Judge Sison 2
Date: 2020.09.24 08:28:35 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**